# United States District Court

### EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

| | | |
|---|---|---|
| ALORICA INC., | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | |
| | § | Civil Action No. 4:24-cv-30 |
| TECH MAHINDRA (AMERICAS) | § | Judge Mazzant |
| INC., | § | |
| | § | |
| *Defendant.* | § | |

## MEMORANDUM OPINION AND ORDER

Pending before the Court is Defendant Tech Mahindra (Americas) Inc.'s Motion for Partial Summary Judgment (Dkt. #101). Having considered the Motion the relevant pleadings, and the applicable law, the Court finds that the Motion should be **GRANTED in part** and **DENIED in part**. Also before the Court is Plaintiff Alorica Inc.'s Motion for Summary Judgment (Dkt. #104). Having considered the Motion, the relevant pleadings, and the applicable law, the Court finds that the Motion should be **GRANTED in part** and **DENIED in part**. Also before the Court is Plaintiff Alorica Inc.'s Motion to Strike Portions of Defendant Tech Mahindra (Americas) Inc.'s Sur-Reply in Further Opposition to Alorica's Motion for Summary Judgment (Dkt. #133). Having considered the Motion, the relevant pleadings, and the applicable law, the Court finds that the Motion should be **DENIED**

## BACKGROUND

This case arises from a contract dispute between Plaintiff and Defendant (collectively the "Parties") concerning customer service outsourcing for AT&T. In April 2021, the Parties executed a contract whereby Plaintiff agreed to provide customer support services for Defendant in support of Defendant's obligations to AT&T (Dkt. #100-4; Dkt. #101 at pp. 8–15; Dkt. #104 at pp. 9–13).

Due to a dispute over billing, the Parties executed an amendment in August 2022, which raised the billing rates for U.S. based full-time employees ("FTEs") and included a plan to transition services to foreign countries (Dkt. #100-34; Dkt. #101 at pp. 8–15; Dkt. #104 at pp. 9–13).[1]

The current dispute centers on the rights and obligations of the Parties with respect to the ramp-down of U.S. based FTEs and ramp-up of foreign based FTEs according to the agreed on Amendment, which included a Transition Plan (setting out the rate at which U.S. FTEs would be ramped down) and Billing Schedule (setting the billing rates for FTEs and the total monthly billing limit Plaintiff could invoice) (*See* Dkt. #1; Dkt. #69; Dkt. #100-34; Dkt. #101; Dkt. #104). Plaintiff contends that AT&T told it to halt certain aspects of the Transition Plan, which created delays and challenges that allowed it to invoice at a different billing rate and limit (Dkt. #104; Dkt. #111; Dkt. #111-16). According to Plaintiff, AT&T's decision created a situation contemplated under the "Excusable Delay" provision of the Amendment, which would permit it to bill at a higher rate and limit than set out under the Transition Plan (Dkt. #100-34; Dkt. #104; Dkt. #111; Dkt. #111-16). Plaintiff concludes that Defendant breached the Contract by failing to pay the invoices it charged under the Excusable Delay provision (Dkt. #1; Dkt. #104; Dkt. #111). Defendant disputes that an Excusable Delay occurred, instead arguing that Plaintiff breached the Contract by unilaterally invoicing it without Defendant's approval of the amount above the billing limit, in violation of the Amendment and Transition Plan (Dkt. #69; Dkt. #101; Dkt. #115).

On January 12, 2024, Plaintiff filed suit for a breach of contract seeking to recover approximately $2.21 million in unpaid invoices (Dkt. #1 at pp. 2–3). Plaintiff asserts the following

---

[1] The Court will refer to the 2021 Contract and the 2022 Amendment collectively as "the Contract." Where necessary, the Court will individually reference the 2022 Amendment as "the Amendment" (Dkt. #100-34).

causes of action: (1) breach of contract, (2) suit on sworn account, (3) quantum meruit, (4) money had and received, (5) promissory estoppel, and (6) unjust enrichment (Dkt. #1 at pp. 3–6). On March 12, 2024, Defendant filed its Answer and asserted counterclaims for breach of contract and promissory estoppel (Dkt. #5 at pp. 5–7). On February 10, 2025, Defendant filed its Second Amended Answer, adding a counterclaim for fraudulent misrepresentation (Dkt. #69 at p. 18).

On March 8, 2025, Defendant filed its Motion for Partial Summary Judgment (Dkt. #101). Plaintiff Responded on March 29, 2025 (Dkt. #111). Defendant filed its Reply on May 6, 2025, and Plaintiff filed its Sur-Reply on May 13, 2025 (Dkt. #122; Dkt. #124). Plaintiff filed its Motion for Summary Judgment on March 11, 2025 (Dkt. #104). Defendant responded to Plaintiff's Motion on May 5, 2025 (Dkt. #115). Plaintiff filed its Reply on May 9, 2025, and Defendant filed its Sur-Reply on May 16, 2025 (Dkt. #128). On May 28, 2025, Plaintiff filed a Motion to Strike Portions of Defendant's Sur-Reply (Dkt. #133). Defendant filed a Response to Plaintiff's Motion to Strike on June 10, 2025 (Dkt. #138). Plaintiff filed a Reply on June 17, 2025 (Dkt. #140). Defendant did not file a Sur-Reply.

## LEGAL STANDARD

The purpose of summary judgment is to isolate and dispose of factually unsupported claims or defenses. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). Summary judgment is proper under Rule 56(a) of the Federal Rules of Civil Procedure "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A dispute about a material fact is genuine when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Substantive law identifies which facts are material. *Id.* The trial court "must

resolve all reasonable doubts in favor of the party opposing the motion [for summary judgment]." *Casey Enters., Inc. v. Am. Hardware Mut. Ins. Co.*, 655 F.2d 598, 602 (5th Cir. 1981).

The party seeking summary judgment bears the initial burden of informing the court of its motion and identifying "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" that demonstrate the absence of a genuine issue of material fact. FED. R. CIV. P. 56(c)(1)(A); *Celotex*, 477 U.S. at 323. If the movant bears the burden of proof on a claim or defense for which it is moving for summary judgment, it must come forward with evidence that establishes "beyond peradventure *all* of the essential elements of the claim or defense." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986). Where the nonmovant bears the burden of proof, the movant may discharge the burden by showing that there is an absence of evidence to support the nonmovant's case. *Celotex*, 477 U.S. at 325; *Byers v. Dall. Morning News, Inc.*, 209 F.3d 419, 424 (5th Cir. 2000). Once the movant has carried its burden, the nonmovant must "respond to the motion for summary judgment by setting forth particular facts indicating there is a genuine issue for trial." *Byers*, 209 F.3d at 424 (citing *Anderson*, 477 U.S. at 248–49). A nonmovant must present affirmative evidence to defeat a properly supported motion for summary judgment. *Anderson*, 477 U.S. at 257. Mere denials of material facts, unsworn allegations, or arguments and assertions in briefs or legal memoranda will not suffice to carry this burden. *See Solomon v. Hous. Corrugated Box Co.*, 526 F.2d 389, 396–97 (5th Cir. 1976). Rather, the Court requires "significant probative evidence" from the nonmovant to dismiss a request for summary judgment. *In re Mun. Bond Reporting Antitrust Litig.*, 672 F.2d 436, 440 (5th Cir. 1982) (quoting *Ferguson v. Nat'l Broad. Co.*, 584 F.2d 111, 114 (5th Cir. 1978)). The Court must consider all of the

evidence but "refrain from making credibility determinations or weighing the evidence." *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007).

## ANALYSIS

Defendant claims that it is entitled to summary judgment (1) on its interpretation of the Contract, (2) that Plaintiff breached the Contract, (3) that Plaintiff's suit on sworn account claim fails as a matter of law, and (4) that Plaintiff's quasi-contract claims fail a matter of law because a valid and enforceable contract governs the dispute (Dkt. #101). Plaintiff claims that it is entitled to summary judgment (1) on its interpretation of the Contract, (2) that Defendant breached the Contract, (3) that it is entitled to judgment as a matter of law on its suit on sworn account claim, (4) that it is entitled to judgment as a matter of law on Defendant's breach of contract and fraudulent misrepresentation claims because Defendant did not suffer any cognizable damages, and (5) that Defendant's promissory estoppel claims fails as a matter of law because there is a valid and enforceable contract that governs the dispute (Dkt. #104). The Court will begin by addressing the interpretation of the Contract in Section I. Also in Section I, the Court will evaluate whether a genuine dispute of material fact exists regarding which Party breached the Contract. In Section II, the Court will evaluate whether Plaintiff or Defendant is entitled to summary judgment on Plaintiff's suit on sworn account claim. Then, in Section III, the Court will evaluate whether Defendant is entitled to summary judgment on Plaintiff's quasi-contract theories. Finally, in Section IV, the Court will evaluate whether Plaintiff is entitled to summary judgment on any of Defendant's counterclaims.

## I.    Breach of Contract

Plaintiff and Defendant both move for summary judgment on their breach of contract claims (Dkt. #101; Dkt. #104). Both argue that the contract is unambiguous, that their

interpretation is the only interpretation, and that factually there is no genuine dispute of material fact (*See* Dkt. #101; Dkt. #104). The Court will begin its evaluation by determining whether the Contract is unambiguous, and if it is, what the respective rights of the Parties are under the Contract. Next, the Court will evaluate whether there is a genuine issue of material fact regarding which Party breached the Contract.

Defendant argues that the Contract sets a firm limit on the monthly billing limit that Plaintiff can invoice (Dkt. #101 at pp. 17–29; Dkt. #115 at pp. 11–27). Defendant's argument rests upon Section 8 of the Amendment, which states that "[t]he total monthly invoice from Alorica to Tech Mahindra shall not exceed the agreed Monthly Billing set forth in the Billing Schedule in Appendix 1, unless otherwise mutually agreed to by the parties" (Dkt. #101; Dkt. #100-34 at p. 5). According to Defendant, this clause requires *any* increase in the billing limit to be agreed on by the Parties (Dkt. #101). Defendant says this reading is supported by Section 6.2, which provides:

> A Transition Plan has been mutually agreed upon between AT&T, Tech Mahindra and Alorica which is attached hereto as Appendix 1. Tech Mahindra and AT&T have agreed not to make changes to the transition plan or invoice schedule. Alorica has agreed to implement the transition plan provided in Appendix 1 with full performance accountability. Alorica agrees to provide efficiency/productivity gains through reduction of US billable headcount by minimum 5 billable headcount within September 2022 and an additional 5 billable headcount within December 2022, contingent to AT&T's agreement to reductions with their written approval. Notwithstanding the foregoing, all parties mutually agree to negotiate a revision of the transition plan and billing schedule in the event AT&T decides to staff a higher proportion of FTEs in the Philippines location or any other global locations. All Parties acknowledge and agree that time is of the essence under this Agreement, and failure of Alorica to meet the deadlines set forth in the transition plan shall constitute a material breach of this Agreement. Except for delays and challenges caused by Excusable Delays as defined below in section 6.4, Alorica and Tech Mahindra agree that if the North American FTE number exceeds the number in the ramp plan for a particular time period, Alorica can only invoice Tech Mahindra the amount associated with the new location to which services should have been transitioned. For example, if in October 2022, Alorica has 217 NA FTE, the excess 20 FTE (217-197) will be billed at $3,700 per month, not $6,200.

(Dkt. #101-34 at p. 4).

Defendant argues that this Section establishes multiple obligations. First, it prohibits Defendant and AT&T from making any changes to the Transition Plan without negotiations (Dkt. #100-34 at p. 4; Dkt. #101 at pp. 17–29). Second, it requires negotiations when there are any change to the billing limit or Transition Plan, in the event that AT&T makes changes the Transition Plan (Dkt. #100-34; Dkt. #101 at pp. 17–29). Third, it requires Plaintiff to bill according to the Billing Schedule, unless a force majeure event occurs, as set out in Section 6.4 as an Excusable Delays (Dkt. #100-34 at pp. 4–5; Dkt. #101 at pp. 17–29). If such an Excusable Delay occurs, Plaintiff may bill at the rate associated with the time period prior to the Excusable Delay (Dkt. #100-34 at p. 4; Dkt. #101 at pp. 17–29). Section 6.4 allows Plaintiff to deviate from the Billing Schedule as to the billing rate, only in the event of a force majeure:

> Alorica shall not be liable for any delay or inability to perform its obligations under this Agreement or otherwise if such delay or inability arises from any Act of God, fire, natural disaster, act of government, pandemic, changes in ramp initiated by AT&T or Tech Mahindra or any other cause beyond the reasonable control of such party which could not be avoided by the exercise of due care. Each party will use its best efforts to minimize the duration and consequences of any failure of or delay in performance resulting from an Excusable Delay.

(Dkt. #100-34 at pp. 4–5; Dkt. #101 at pp. 17–29). According to Defendant, Plaintiff breached the Contract because no Excusable Delay occurred and Plaintiff attempted to unilaterally bill at a higher rate and impose higher billing limits in violation the Contract (*See* Dkt. #101 at pp. 17–29).

Plaintiff argues that Defendant's reading renders the Excusable Delay provision meaningless (Dkt. #104; Dkt. #111). To Plaintiff, the Contract can be read harmoniously by understanding that Section 6.2 sets up a general framework and an exception (*See* Dkt. #104; Dkt. #111). Plaintiff agrees that Defendant's understanding is generally how the Contract works— i.e., under the general framework the billing limits, Billing Schedule, and Transition Plan control

7

(*See* Dkt. #104; Dkt. #111). However, Plaintiff argues that challenges and delays arising from an Excusable delay allow for a higher billing rate and limit than set out in the Transition Plan and Billing Schedule (*See* Dkt. #104; Dkt. #111). Should an Excusable Delay arise, Plaintiff is permitted to invoice for the full *amount* that it incurred, pursuant to the Billing Schedule at the time immediately prior to the delay or challenge (*See* Dkt. #104 at pp. 13–22; Dkt. #111 at pp. 12–28; Dkt. #124 at pp. 4–6). More specifically, when an Excusable Delay occurs, Plaintiff argues that it can invoice at the same billing rate *and billing limit* as the time prior to the delay (*See* Dkt. #104 at pp. 13–22; Dkt. #111 at pp. 12–28; Dkt. #124 at pp. 4–6). Further, Section 8's requirement for an agreement to increase the billing limit is met because the Parties mutually agreed to the Excusable Delay exception, thus no further negotiations are required (*See* Dkt. #104 at pp. 13–22; Dkt. #111 at pp. 12–28; Dkt. #124 at pp. 4–6). As set out below, the Court agrees with Plaintiff.

The first step for the Court is to determine whether the Contract is unambiguous, and, if it is, to determine the respective rights and obligations the Parties agreed to be bound by. The Court, sitting in diversity, applies Texas contract law. *H.E. Butt Grocery Co. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 150 F.3d 526, 529 (5th Cir. 1998).[2] Under Texas law, whether the language of a contract is ambiguous is a question of law for the Court. *Hennigan v. Chargers Football Co.*, 431 F.2d 308, 314 (5th Cir. 1970). Neither Party argues that the Contract is ambiguous (*See* Dkt. #101; Dkt. #104; Dkt. #111; Dkt. #115). However, "[a] court may conclude that a contract is ambiguous even in the absence of such a pleading by either party." *Sage St. Assocs. v. Northdale Constr. Co.*, 863 S.W.2d 438, 445 (Tex. 1993).

---

[2] The Parties do not dispute that Texas law applies to this dispute (*See* Dkt. #101; Dkt. #104; Dkt. #111; Dkt. #115).

"If a written instrument is so worded that it can be given a certain or definite legal meaning or interpretation, then it is not ambiguous and the court will construe the contract as a matter of law." *SAS Inst., Inc. v. Breitenfeld*, 167 S.W.3d 840, 841 (Tex. 2005) (citing *Coker v. Coker*, 650 S.W.3d 391, 393 (Tex. 1983)). When a contract is unambiguous, extrinsic evidence "will not be received for the purpose of creating an ambiguity or to give the contract a meaning different from that which its language imports." *Skyland Devs., Inc. v. Sky Harbor Assocs.*, 586 S.W.2d 564, 568 (Tex. App—Corpus Christi 1979, no writ) (quoting *Universal C.I.T. Credit Corp. v. Daniel*, 243 S.W.2d 154, 157 (Tex. 1951)). The Court must enforce unambiguous contractual language as written. *See Sun Oil Co. (Del.) v. Madeley*, 626 S.W.2d 726, 731–32 (Tex. 1981). The applicable standard is the "objective intent" evidenced by the language used, rather than the subjective intent of the parties. *See id.*

Contract terms "are given their plain, ordinary, and generally accepted meanings unless the contract itself shows them to be used in a technical or different sense." *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 662 (Tex. 2005). The Court's primary concern is to enforce the parties' intent as expressed in the contract. *Sundaram v. Nemeth*, No. 1:06-CV-712, 2008 WL 80017, at *9 (E.D. Tex. Jan. 7, 2008). When construing a contract, the intention of the parties is to be gathered from the instrument as a whole. *See Seagull Energy E&P, Inc. v. Eland Energy, Inc.*, 207 S.W.3d 342, 345 (Tex. 2006). The "court is bound to read all parts of a contract together to ascertain the agreement of the parties." *Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 133 (Tex. 1994). "No single provision taken alone will be given controlling effect; rather, all the provisions must be considered with reference to the whole instrument." *SAS Inst., Inc.*, 167 S.W.3d at 841.

The Court may not consider extrinsic evidence to contradict or vary the meaning of unambiguous language in a written contract in order to create an ambiguity. *Sears, Roebuck & Co. v. Com. Union Ins. Corp.*, 982 S.W.2d 151, 154 (Tex. App.—Houston [1st Dist.] 1998, no pet.). The Court may consider the parties' interpretations of the contract through extrinsic or parol evidence only after a contract is first determined to be ambiguous. *See Friendswood Dev. Co. v. McDade & Co.*, 926 S.W.2d 280, 283 (Tex. 1996). An "ambiguity must become evident when the contract is read in context of the surrounding circumstances, not after parol evidence of intent is admitted to create an ambiguity." *Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. CBI Indus., Inc.*, 907 S.W.2d 517, 521 (Tex. 1995). One of the exceptions to the parol evidence rule is that if the written instrument itself shows to be either ambiguous or incomplete, parol testimony is admissible to show what the real contract was to the extent necessary to remove the ambiguity, and to make the contract complete in its terms which show to be incomplete. *Warren Bros. Co. v. A.A.A. Pipe Cleaning Co.*, 601 S.W.2d 436, 438 (Tex. App.—Houston [1st Dist.] 1980, writ ref'd n.r.e.) (quoting *Magnolia Warehouse & Storage Co. v. Davis & Blackwell*, 195 S.W. 184, 185 (1917)). In other words, "[w]here a writing is incomplete or ambiguous, parol evidence is admissible to explain the writing or to assist in the ascertainment of the true intentions of the parties insofar as the parol evidence does not alter or contradict any part of the written memorandum in question." *Id.* at 438–39.

If, after application of the pertinent rules of construction, the contract is subject to two or more reasonable interpretations, the contract is ambiguous, and a fact issue exists regarding the parties' intent. *Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.*, 940 S.W.2d 587, 589 (Tex. 1996). A lack of clarity in the language chosen by the parties does not suffice to render an agreement ambiguous. *Universal C.I.T. Credit Corp.*, 243 S.W.2d at 157. Rather, "[o]nly if the intention of the

parties as expressed on the face of the document is doubtful may the court resort to parol evidence to resolve the doubt." *Massey v. Massey*, 807 S.W.2d 391, 405 (Tex. App.—Houston [1st Dist.] 1991, writ denied). An ambiguity does not arise simply because the parties advance conflicting interpretations of their agreement. *See Forbau*, 876 S.W.2d at 134.

For an ambiguity to exist, both interpretations must be reasonable. *Columbia Gas*, 940 S.W.2d at 589. It is for the Court to decide whether there is more than one reasonable interpretation of a contract, thereby creating a fact issue concerning the parties' intent. *Id*. "If the contract contains an ambiguity, summary judgment is improper 'because the interpretation of the instrument becomes a fact issue.'" *Gilliland v. Cornell Companies, Inc.*, No. H-07-1655, 2008 WL 4858353, at *6 (S.D. Tex. Nov. 10, 2008) (quoting *Coker*, 650 S.W.2d at 393).

The Court finds that the Contract is unambiguous. The Parties' primary dispute revolves around the language of Section 6.2 of the Amendment. Specifically, they dispute the meaning of the following provision:

> Except for excusable delay and challenges caused by Excusable Delays as defined below in section 6.4, Alorica and Tech Mahindra agree that if the North American FTE number exceeds the number in the ramp plan for a particular time period, Alorica can only invoice Tech Mahindra the amount associated with the new location which services should have been transitioned.

(Dkt. #100-34 at p. 4). This provision sets out two obligations. First it sets up a general rule: Plaintiff can only invoice according to the Transition Plan and Billing Schedule, even if a delay occurs. Should a delay occur, Plaintiff will invoice as if those FTEs had transitioned according to the Transition Plan. In other words, the "amount"—i.e., *rate* and *billing limit*—in the Billing Schedule continue to apply in full force and affect (Dkt. #100-34 at p. 4).

Second, the provisions sets up an exception to the general rule: Plaintiff can bill at the status quo amount—i.e., the *rate* and *billing limit*—attributable to the month of a delay or challenge when

an "Excusable Delay" arises (Dkt. #100-34). In other words, when a specific, approved reason for the delay or challenge in the transition of FTEs arises, Plaintiff can invoice for the amount it had previously invoiced Defendant for. This makes sense, as it recognizes that there may be circumstances where Plaintiff cannot transition to the planned amount of FTEs but will not be required to perform the same amount of services at a discount (i.e., lower rate) or for free (i.e., exceeding the billing limit due to the higher rate for the same amount of work without the ability to invoice for the full amount that month) (*See* Dkt. #100-34).

Further, the Billing Schedule clearly recognizes that the billing limit is tied to the lower billing rates that Plaintiff will charge as it transitions FTEs out of the U.S. (*See* Dkt. #100-34 at p. 8). The Billing Schedule clearly shows a direct relationship between the increase in billing by non-U.S. FTEs at a lower rate and the billing limit—i.e., as cheaper labor is employed the total invoice amount decreases because the same work is performed at a lower cost (Dkt. #100-34 at pp. 7–8). Thus, should the billing rate not decrease, the billing limit would also not decrease, as they both decrease in tandem (*See* Dkt. #100-34 at p. 8). Should the billing limit decrease while the billing rate remained the same, the effect would essentially be a decrease in the rate as well because Plaintiff would still perform the same amount of work without the possibility of payment (*See* Dkt. #100-34). This is because the billing limit would not make the corresponding adjustment in connection with the rate being billed (*See* Dkt. #100-34 at p. 8). Therefore, the Contract is unambiguous. The Excusable Delay exception permits Plaintiff to bill at the rate and limit at the time prior to an Excusable Delay should one arise (*See* Dkt. #100-34).

The Amendment defines an Excusable Delay in Section 6.4: "Alorica shall not be liable for any delay or inability to perform its obligations under this Agreement or otherwise if the delay or

inability arises from . . . changes in ramp initiated by AT&T" (Dkt. #100-34 at p. 4). Thus, if AT&T initiates a change in "ramp," Plaintiff can maintain the status quo billing rate and billing limit from the time AT&T initiated the change (*See* Dkt. #100-34). The Amendment does not explicitly define the term "ramp" (*See* Dkt. #100-34). However, contextually, the term "ramp plan" and "ramp" are referring to the Transition Plan, which outlines the timeline to decrease U.S. based FTEs and increase foreign based FTEs (*See* Dkt. #100-34).[3] Therefore, when AT&T initiates a change to the increase in foreign based FTEs or decrease in the U.S. based FTE's, any challenge or delay on Plaintiff's part is excused and it may use the exception to bill at the status quo rate and billing limit at the time of AT&T's change (*See* Dkt. #100-34).

When taken as a whole, the exception applies in the following way: (1) AT&T changes the ramp up of FTEs, which creates a challenge or delay, (2) due to the challenge or delay, Plaintiff may invoice for the amount consistent with Billing Schedule prior to the challenge or delay, not the planned amount, (3) billing for this amount includes billing at the same rate and at the same limit because those terms work together, and (4) Plaintiff does not need to seek an increase to the billing limit under Section 8, as the Parties mutually agreed to the exception, which necessarily permits Plaintiff to invoice at the amount before the Excusable Delay (*See* Dkt. #100-34). In contrast to the exception, the general rule requires Plaintiff to follow the Transition Plan and Billing Schedule if any delay not subject to the exception arises (Dkt. #100-34). In sum, Plaintiff cannot exceed the

---

[3] This understanding of the term 'ramp' is consistent with dictionary definition of 'ramp' when used as a verb: "(1) to speed up, expand, or increase especially quickly or at a constant rate" *Dictionary*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/ramp. As noted by the Merriam-Webster Dictionary, the use of ramp as a verb is typically used in the context of 'ramp up.' *Id.* In the context of the Contract, 'ramp' and 'ramp plan' unambiguously reference ramping up the foreign FTEs and ramping down the U.S. based FTEs, pursuant to the Transition Plan (*See* Dkt. #100-34).

Billing Schedule's billing limits unless one of two conditions is met: (1) the Parties agree to the increase, or (2) an Excusable Delay arises (*See* Dkt. #100-34).

If Defendant's reading were correct, the Excusable Delay exception would be rendered meaningless. According to Defendant, the exception only permits Plaintiff to maintain the same billing rate, but not the billing limit (Dkt. #101 at pp. 17–40; Dkt. #115 at pp. 11–27; Dkt. #122 at pp. 6–11; Dkt. #128 at pp. 5–7). To Defendant, Section 8 of the Amendment prohibits any increase in the billing limit, regardless of whether an Excusable Delay arises (Dkt. #101 at pp. 17–40; Dkt. #100-34 at p. 5; Dkt. #115 at pp. 11–27; Dkt. #122 at pp. 6–11; Dkt. #128 at pp. 5–7). In other words, Defendant's reading result in the following situation: (1) Plaintiff can bill at the higher rate, (2) Plaintiff must provide the same amount of work, (3) despite the higher rate, Plaintiff cannot exceed the lower billing limit, so (4) Plaintiff will not be paid in excess of the billing limit for the same amount of work at an approved amount (i.e., Plaintiff must provide free labor) unless Defendant agrees to pay (*See* Dkt. #100-34; Dkt. #101 at pp. 17–40; Dkt. #115 at pp. 11–27; Dkt. #122 at pp. 6–11; Dkt. #128 at pp. 5–7). Thus, on Defendant's reading, the exception for Excusable Delays is essentially meaningless because it requires Plaintiff to perform the agreed amount of work at a higher billing rate but with a lower billing limit. In essence, the general rule still applies—Plaintiff can only invoice at the amount according to the Transition Plan for any delays that arise. As this reading renders the mutually agreed on exception meaningless, the Court rejects it. *Baylor Cnty. Special Util. Dist. v. City of Seymour*, 709 S.W. 5, 13 (Tex. App—Eastland 2025, pet. filed) (citing *Eagle Oil & Gas Co. v. TRO-X, L.P.*, 416 S.W.3d 137, 144 (Tex. App.—Eastland 2013, pet. denied)); *Coker*, 650 S.W.2d at 393.

This leads back to the current dispute: whether AT&T's halt to the Transition Plan constituted an Excusable Delay as contemplated by the Contract, or whether it was a revision of the Transition Plan which required negotiations between Plaintiff, Defendant, and AT&T (Dkt. #100-34; Dkt. #111-16) ("all parties mutually agree to negotiate a revision of the transition plan and billing schedule in the event AT&T decides to staff a higher proportion of FTEs in the Philippines location or any other global locations"). Plaintiff says it is an Excusable Delay, so it should be permitted to recover under the Contract (*See* Dkt. #104; Dkt. #111). Defendant argues that AT&T's halt is a revision, thus Plaintiff breached the contract by failing to negotiate and instead opting to unilaterally amend the Contract (*See* Dkt. #101; Dkt. #115). Ultimately, whether AT&T's halt to the Transition Plan constituted an Excusable Delay or a revision is a question for the jury. Accordingly, the Court finds that it should grant Plaintiff's Motion for Summary Judgment and deny Defendant's Motion for Summary Judgment as to the interpretation of the Contract. The Court further finds that it should deny both Motions as they relate to liability for breach of contract, whether an Excusable Delay or revision occurred, and the amount of damages suffered, as those issues are replete with questions for the jury.

## II.    Sworn Account

Defendant argues that it is entitled to summary judgment on Plaintiff's suit on sworn account theory because Plaintiff's breach of contract theory fails as a matter of law (Dkt. #101 at pp. 40–41). Plaintiff responds that it, not Defendant, is entitled to summary judgment because Defendant failed to file a verified denial to Plaintiff's suit on a sworn account (Dkt. #104 at pp. 23–26; Dkt. #111 at pp. 37–42). Without a verified denial, Plaintiff argues that Texas law prohibits Defendant from contesting the amount it owes Plaintiff (Dkt. #104 at pp. 23–26; Dkt. #111 at pp. 37–42). Defendant responds by arguing that the requirement for a verified denial

15

is a Texas procedural rule, which is not required in federal courts under the *Erie* doctrine (Dkt #128 at pp. 7–11). The Court has already found that neither party is entitled to summary judgment on their breach of contract theories. Accordingly, Defendant is not entitled to summary judgment on Plaintiff's suit on a sworn account claim, as its arguments are wholly premised on the success on its motion for summary judgment as to the breach of contract claim (*See* Dkt. #101 at pp. 40–41).

The Court agrees with Defendant that Plaintiff is not entitled to summary judgment on its suit on sworn account claim. A suit on a sworn account is governed by Texas Rule of Civil Procedure 185, which, in part, requires a defendant to file a verified denial. Under *Erie*, a federal court will apply federal procedural rules. *See Erie R.R. v. Tompkins*, 304 U.S. 64 (1938); *Sunshine Traders of El Paso, Inc. v. Dolgencorp, Inc.*, 219 F. App'x 375, 376–77 (5th Cir. 2007). Thus, when a suit on a sworn account is brought in federal district court, a verified denial is not required. *See Sunshine Traders*, 219 F. App'x at 376–77; *see also Sneed Shipbuilding, Inc. v. Spanier Marine Corp.*, 125 F.R.D. 438, 443–44 (E.D. Tex. 1989) (finding that a verified denial is not required for a suit on sworn account in federal court and noting that the "Texas Supreme Court has characterized Rule 185 as a procedural rule . . . not a rule of substantive law."); *Cinco J., Inc. v. Pressure Trucks, Inc.*, No. SA-15-CV-214-XR, 2015 WL 1957108, at *2–4 (W.D. Tex. Apr. 29, 2015). Thus, Defendant was not required to file a sworn denial. Additionally, a suit on a sworn account requires that the charges are just, which means that they were charged in accordance with an agreement. *See, e.g.*, *Coim USA Inc. v. Sjobrand Inc.*, 663 F. Supp. 3d 684, 689 (N.D. Tex. 2023). Defendant challenges whether the disputed charges were made in accordance with the Contract. Accordingly, there is a genuine issue of material fact—i.e., whether Defendant must pay those amounts under the

Contract at all—and summary judgment is inappropriate at this time. Thus, the Court finds that it should deny the Motions as to Plaintiff's suit on sworn account claim.

### III.    Plaintiff's Quasi-Contract Claims

Defendant argues that it is entitled to summary judgment on all of Plaintiff's quasi-contract claims because a valid and enforceable contract governs the dispute (Dkt. #101). Plaintiff does not dispute Defendant's entitlement to summary judgment on its promissory estoppel and money had and received claims (*See* Dkt. #111; Dkt. #124). However, Plaintiff argues that it can maintain its quantum meruit and unjust enrichment claims because a plaintiff can proceed with a breach of contract and quantum meruit claim when a contract has been partially performed (Dkt. #111 at pp. 38–39). According to Plaintiff, the same is true for its unjust enrichment claim (Dkt. #111 at pp. 38–39). Defendant counters that Plaintiff misstates the law because partial performance only permits the advancement of a quasi-contract claim with a breach of contract in one of two circumstances: (1) when a plaintiff partially performed an express contract but was prevented from completing the contract because of the defendant's breach, and (2) when a plaintiff partially performs an express contract that is unilateral in nature (Dkt. #122 at p. 13) (citing *In re KP Eng'g, L.P.*, 63 F.4th 452, 456–57 n.2 (5th Cir. 2023) (citing *Pepi Corp. v. Galliford*, 354 S.W.3d 457, 462–63 (Tex. App.—Houston [1st Dist.] 2007, pet. denied)). Defendant argues that neither of those conditions are met and it is entitled to summary judgment on the quantum meruit and unjust enrichment claims (Dkt. #122 at p. 13). The Court agrees with Defendant.

A party may recover under quasi contract theories only when no express contract covering the services or materials furnished exists. *See, e.g.*, *Birchler v. JPMorgan Chase Bank*, No. 4:14-CV-81, 2015 WL 1939438, at *6 (E.D. Tex. Apr. 29, 2015) (citing *First Union Nat'l Bank v. Richmont Cap. Partners I, L.P.*, 168 S.W.3d 917, 931 (Tex. App.—Dallas 2005, no pet.)) ("Generally speaking,

when a valid, express contract covers the subject matter of the parties' dispute, there can be no recovery under a quasi-contract theory . . . because the parties should be bound by their express agreements."); *Truly v. Austin*, 744 S.W.2d 934, 936 (Tex. 1988). However, the existence of an express contract does not preclude recovery for services rendered and accepted which are not covered by the contract. *See, e.g.*, *Black Lake Pipe Line Co. v. Union Const. Co., Inc.*, 358 S.W.2d 80, 86 (Tex. 1976), *overruled on other grounds by Sterner v. Marathon Oil Co.*, 767 S.W.2d 686 (Tex. 1989).

Here, the question is whether the exception for Excusable Delays applies or whether the general rule in Section 6.2 of the Amendment applies. Thus, the services rendered were covered under the Contract. Even though Plaintiff argues that an exception for partial performance applies, the Court finds these arguments unavailing (Dkt. #111 at pp. 38–39). This dispute falls squarely within the bounds of the Contract and the Court finds that none of the exceptions Plaintiff argued for apply to this case. *See In re KP Eng'g*, 63 F.4th at 456–57. Accordingly, as the disputed services are expressly covered by the Contract, no genuine issue of material fact exists and the Court finds that it should grant Defendant summary judgment on Plaintiff's quasi-contract claims of quantum meruit, unjust enrichment, promissory estoppel, and money had and received. *See Birchler*, 2015 WL 1939438, at \*6; *First Union Nat'l Bank*, 168 S.W.3d at 931).

## IV.    Defendant's Counterclaims

Plaintiff argues that Defendant's counterclaims for breach of contract and fraudulent misrepresentation should be dismissed because it has not established it suffered any damages (Dkt. #104; Dkt. #123). According to Plaintiff, Defendant has only submitted evidence that it incurred legal fees and expenses, which are unrecoverable as compensatory damages (Dkt. #104 at pp. 32–36). Further, it argues that Defendant has not given any concrete amount that calculates the alleged loss of time damages it claims it suffered (Dkt. #104 at pp. 32–36). Defendant argues that it

18

has presented evidence of damages in three different areas: (1) the costs to negotiate with Plaintiff on the Contract that it did not intend to honor; (2) the costs when it attempted to bring Plaintiff into compliance with the Contract; and (3) the costs to repair its relationship with AT&T (Dkt. #115 at pp. 30–35). In sum, Defendant seeks to recover damages for the loss of time that it could otherwise have spent on valuable business enterprises (Dkt. #115 at pp. 30–35). Defendant concedes it cannot recover litigation expenses as actual damages, but it maintains that it can recoup its loss of time expenses from Plaintiff (*See* Dkt. #115 at pp. 30–31). Notably, Defendant does not provide evidence of the explicit amount of damages it seeks to recover (*See* Dkt. #115).

Plaintiff's Reply focuses on its entitlement to summary judgment on two grounds. First, it argues that Defendant did not provide any evidence of the amount of damages, and thus there is no genuine issue of fact regarding the damages Defendant suffered (Dkt. #123 at pp. 9–10). Second, it returns to its argument that Defendants claimed damages are unrecoverable because they are litigation expenses (Dkt. #123 at pp. 9–10). Defendant responds in its Sur-Reply that it adequately presented its claims for damages and attaches evidence of those amounts (Dkt. #128 at pp. 11–13).

In response to Defendant's Sur-Reply, Plaintiff filed a Motion to Strike the Sur-Reply and any evidence of damages that was not presented in Defendant's Response (Dkt. #133). Plaintiff argues that Defendant waived its ability to present evidence in a Sur-Reply because it was not attached to its Response, thus the Court should not consider it (Dkt. #133). Defendant argues that it attached the evidence to respond to the arguments raised in Plaintiff's Reply (Dkt. #138). Further, it argues that courts in the Fifth Circuit permit such evidence to be attached in a Sur-Reply (Dkt. #138). Plaintiff argues that Defendant's response is inapposite and the Court should adopt the position it did when it adopted Judge Nowak's Report and Recommendation in a different case

striking new summary judgment evidence attached to a Sur-Reply (Dkt. #140) (citing *Deutsche Bank Nat'l Tr. Co. as Tr. of Aames Mortg. Inv. Tr. 2005-1 v. Mortberg*, No. 4:14-CV-000875-ALM-CAN, 2020 WL 7658065, at *7 (E.D. Tex. Nov. 16, 2020), *report and recommendation adopted*, No. 4:19-CV-875, 2021 WL 716750 (E.D. Tex. Feb. 24, 2021)). The Court agrees with Defendant that the evidence it submitted was responsive to Plaintiff's Reply, in compliance with Local Rule CV-7(f). Accordingly, the Court finds it should deny Plaintiff's Motion to Strike. *See, e.g.*, *Bongalis-Royer v. RJ Worldwide, LLC*, 2015 WL 12837652, at *2 (E.D. Tex. July 16, 2015) ("simply because Plaintiff could have offered evidence for one purpose in the Opposition does not mean that Plaintiff is barred from offering it for a proper purpose in the surreply.").

The Court will now address the merits of Plaintiff's Motion for Summary Judgment as to Defendant's breach of contract and fraudulent misrepresentation counterclaims. After a careful review of the record and the arguments presented, the Court is not convinced that Plaintiff has met its burden of demonstrating that there is no material issue of fact as it relates to Defendant's claims for damages that would entitle Plaintiff to judgment as a matter of law. Accordingly, the Court finds that Plaintiff is not entitled to summary judgment on Defendant's breach of contract and fraudulent misrepresentation claims.

Plaintiff also argues that it is entitled to summary judgment on Defendant's promissory estoppel claim (Dkt. #104 at pp. 36–37). Defendant concedes that Plaintiff is entitled to summary judgment on this claim because the Contract is valid and enforceable (Dkt. #115 at p. 7 n.2). Accordingly, the Court finds that it should grant Plaintiff summary judgment on Defendant's promissory estoppel claim.

## CONCLUSION

It is therefore **ORDERED** that Defendant Tech Mahindra (Americas) Inc.'s Motion for Partial Summary Judgment (Dkt. #101) is hereby **GRANTED in part** and **DENIED in part**. Defendant's Motion is **GRANTED** with respect to Plaintiff's claims for quantum meruit, unjust enrichment, promissory estoppel, and money had and received. Those claims are hereby **DISMISSED with prejudice**. Defendant's Motion for Summary Judgment is **DENIED** as to all other issues raised.

It is further **ORDERED** that Plaintiff Alorica Inc.'s Motion for Summary Judgment (Dkt. #104) is hereby **GRANTED in part** and **DENIED in part**. Plaintiff's Motion is **GRANTED** with respect to the interpretation of the Contract. Plaintiff's motion is also **GRANTED** with respect to Defendant's claim for promissory estoppel, and it is hereby **DISMISSED with prejudice**. Plaintiff's Motion is **DENIED** as to all other issues raised.

It is further **ORDERED** that Plaintiff Alorica Inc.'s Motion to Strike Portions of Defendant Tech Mahindra (Americas) Inc.'s Sur-Reply in Further Opposition to Alorica's Motion for Summary Judgment (Dkt. #133) is hereby **DENIED**.

**IT IS SO ORDERED.**

**SIGNED this 28th day of August, 2025.**

AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE